WILLIAMS, survivor, &c. *vs.* DAKIN & BACON.

Whether a sum agreed upon by the parties to a contract as the measure of damages, shall be considered as *liquidated damages*, or only as a *penalty*, depends upon the *intent* of the parties and the peculiar circumstances of the subject matter of the contract; *if the damages must necessarily be wholly uncertain and incapable of estimation*, the party failing to perform will be held to pay the stipulated sum as liquidated damages, and *it was accordingly held*, where the plaintiffs gave $3000 for the patronage and good will of a newspaper establishment, and $500 for the type and printing apparatus, and the defendants (the venders) covented that they would not publish or aid or assist in publishing a rival paper, and fixed the meas-ure of damages for a violation of their covenant at $3000, and did subse-quently aid and assist in the publication of such paper, that the plaintiffs were entitled to recover the whole sum of $3000 as liquidated damages.

Williams v. Dakin.

Although where an estate is granted *subject to a condition*, and the grantee is *released* from a *part* thereof, the *whole* condition is gone, the same rule does not prevail in respect to a *covenant* not coupled with a condition ; and it was accordingly held, in this case, where the plaintiffs *released* the defendants from their *covenant* so far as to permit them to publish a paper of a *peculiar character*, that such release did not excuse them for subsequently publishing or aiding in the publication of a paper *different* from that specified in there lease.

ERROR from the supreme court. On the 10th May, 1825, Dankin & Bacon bought of W. Williams a newspaper establishment, known as the *Utica Sentinel,* and the good will and patronage of the paper, for which they agreed to pay $3500 ; viz: $3000 for the patronage and good will of the establishment, and $500 for the types and printing apparatus ; and the parties accordingly entered into an agreement under seal to carry the purchase into effect. A. Seward, uniting with W. Williams, these parties covenanted as follows : " That they will not, nor will either of them, establish, set up or commence the publishing, editing or printing of any paper of a literary, political or miscellaneous character, in the village of Utica, or county of Oneida, during the time the parties of the second part, or either of them, or their or either of their immediate assigns shall continue the publishers or proprietors of any paper in the aforesaid village. And they further agree, that they will not, nor will either of them, suffer any such paper to be published or printed in any building owned by them or either of them ; and that they will not aid or assist, or be in any way or manner accessary to the printing or publishing of any such paper, by any person or persons whatsoever, in the aforesaid village or county, during the time above specified." For the faithful performance of which covenant, Williams and Seward bound themselves in the sum of $3000. Then followed a mutual stipulation that the said sum of $3000, should be and was thereby fixed and settled as *liquidated damages* and *not as a penal sum* for any violation of the covenant, or any of its terms or conditions. In January, 1826, Williams sold a quanity of type to one *Merrell,* and rented to him a *printing press,* with which type and press he published a political newspaper, called the *Utica Intelligencer,* which was

continued for 16 months, and Williams occasionaly advertised in it. The first page of the first number of the paper was set up by Merrill in the printing shop of Williams, in Utica, but without the actual knowledge of Williams or Seward. In June, 1830, one G. S. Wilson contemplating the establishment of a newspaper of a political, miscellaneous and literary character, to be called the *American Citizen*, employed Williams to print 1000 copies of the first number of the paper, as a specimen of the contemplated publication; who accordingly printed the said 1000 copies, stating in the same that it was printed by him, and containing an advertisement of his own as an advertising customer. The publication of the *American Citizen* was continued in Utica by Wilson for 29 weeks, during which time R. Northway, junior, and D. S. Porter, assignees of Dakin & Bacon, were the publishers of a newspaper in the village of Utica, called the *Sentinel and Gazette*. Previous to the publication of the *American Citizen*, to wit, in January, 1830, Dakin, (who had become solely interested in the covenant of Williams & Seward, by the relinquishment of Bacon,) for the consideration of one dollar, released Williams & Seward from their covenant "as to the editing, printing or publishing of an anti-masonic paper called the *Elucidator*, so long as it shall be anti-masonic." In January, 1831, an action of debt was commenced in the names of Dakin & Bacon, against Williams & Seward on the instrument of the 10th May, 1825, in which the plaintiffs assigned as breaches the conduct of Williams in respect to the publication of the two newspapers called the *Utica Intelligencer* and the *American Citizen*. The cause was put at issue and tried by a jury, who found a *special verdict*, setting forth the above facts, and concluding by finding $3000 for the plaintiffs, if, &c. The supreme court decided that the $3000 should be considered as *liquidated damages*, and not as a *penalty*, and gave judgment accordingly for the plaintiffs. See the case more fully stated, and the opinion delivered by the chief justice. 17 *Wendell*, 447, *et seq.* The defendants sued out a writ of error.

The cause was argued in this court by

*W. C. Noyes, & J. A. Spencer*, for the plaintiffs in error.

*C. P. Kirkland*, for the defendants in error.

*Points insisted on by the counsel for the plaintiffs in error:*

*First.* The special verdict does not find any breach of the covenant of the defendants below.

*Second.* The $3000 should be regarded as a penalty and not as liquidated damages. Otherwise the same amount would be recovered for the slightest infraction of the covenant as for the establishment and continuance of a rival paper during the whole period. *Astley* v. *Weldon, 2 Bos. & Pull.* 346. *Barton* v. *Glover, Holt's N. P.* 43 *and note. Reilly* v. *Jones,* 1 *Bing.* 302. *Davies* v. *Penton,* 6 *Barn. & Cress.* 216. *Crisdee* v. *Bolton,* 3 *Carr. & Payn.* 240. *Randall* v. *Everest,* 2 *id.* 577. *Kemble* v. *Farren,* 6 *Bing.* 141. *Dennis* v. *Cummins,* 3 *Johns. Cas.* 297. *Slosson* v. *Beadle,* 7 *Johns. R.* 72. *Spencer* v. *Tilden,* 5 *Cowen,* 144. *and note. Nobles* v. *Bates,* 7 *id.* 307. *Hardy* v. *Bern,* 5 *Durn. & East,* 636.

*Third.* Whether the $3000 be regarded as *liquidated damages* or as a *penalty* it is an *entirety*; it is not divisible. The release of Dakin to the plaintiffs in error of and from this covenant so far as related to the printing and publishing the paper called the Elucidator, discharged the whole *penalty* or *liquidated amount*. It broke the *entire* thing and voluntarily surrendered it for value. *Dumport's case, Cro. Eliz.* 815. *Shep. Touch.* 159. *Winter's case, Dyer,* 309, (*a*). 3 *Com. Dig.* 132, *Condition Q. Viner Ab.* Condition *G. d. pl.* 2, 3. *Rowley* v. *Stoddard.* 7 *Johns. R.* 207. *DeZeng* v. *Bailey, and others,* 9 *Wendell,* 337. *Brummell* v. *Macpherson,* 14 *Ves.* 173. *Bleecker* v. *Smith,* 13 *Wendell,* 530.

*Points insisted on by the counsel for the defendants in error :*

I. The finding of the special verdict establishes a manifest violation by the defendants below of their covenant both in its letter and in its spirit.

Williams v. Dakin.

1. Their covenant is as broad and comprehensive as language can make it, intended to prevent any interference in any way or manner, direct or indirect, in a great or small degree, by the defendants below or either of them, with the establishment cotemporaneously purchased by plaintiffs below.

2. The acts of Williams in relation to the Intelligencer, in furnishing types and press for printing it, in permitting the use of his printing room for that purpose, and in advertising in it, were a violation of the covenant.

3. It was manifestly and grossly violated by the acts of Williams in reference to the American Citizen.

II. The acts (in relation to the American Citizen) were *per se* a violation of the covenant, and they can be viewed in no light and receive no construction to give them any different effect.

1. The number of the paper produced and forming a part of the special verdict, itself furnishes conclusive evidence. It is in all respects—in substance and in form, a *newspaper*. It professes on its face to be printed by Williams. It appeals to the public for support and patronage; and this appeal has the sanction of Williams' name. It contains a long and conspicuous advertisement from Williams.

2. The number thus printed by Williams was *intended and designed* as the first number of the paper—as its commencement, if patronage to continue it could be obtained. His printing office was "an old and established office, of the first standing and reputation in the country, and its issuing from that office was calculated to give credit and character to the paper."

3. By printing the paper—by giving it on its face the credit of his name as printer—by advertising in it, Williams most effectually "aided and assisted" in its establishment, and was actually "accessary to its printing and publishing."

4. The paper was *in fact* thereby "commenced and established:" No. 2 was issued four weeks afterwards, and the paper was continued for several months. It then, had its origin and commencement—its existence in and by

these acts of Williams. In the very language of his covenant "he *commenced the printing*" of the paper.

III. This covenant is to be governed and construed by precisely the same rules as if the liquidated damages had been six cents instead of three thousand dollars. The *amount* can in no manner vary the principle. Had this been a covenant without liquidated damages, or had those damages been stipulated at a trifling sum, it can scarcely be supposed that even the defendants below would have denied their liability under the facts found in this case.

I.V. The breaches (in the language of the covenant) occurred " during the time the plaintiffs below, or one of them, or the immediate assigns of them, or one of them, were publishers or proprietors of a paper in Utica."

V. This is a clear case of *liquidated* damages. The rule is, that where some of the breaches are *certain,* in their nature and amount, and others are *uncertain,* the sum declared by the parties to be payable in the event of a breach is a *penalty ;* but where all the breaches are *uncertain* in their amount, that sum is *liquidated* damages, if so expressly declared by the parties. This case manifestly falls within the latter class.

VI. The paper executed by Dakin on the 22d January, 1830, can in no manner operate to release or discharge the defendants below from the liability arising from the breaches of their covenant found by the special verdict.

1. This paper is, like every other, to be so construed as to effect its purpose and intent. Manifestly neither Dakin nor the defendants below contemplated any effect from this paper other than that specified in it and declared on its face : to wit, to exempt the publication of the Elucidator from the operation of the covenant. That publication may have been harmless to the plaintiffs below, while another might have been ruinous.

2. It does not appear whether this paper was given prior or subsequent to the publication of the Elucidator ; if prior, it was a mere permission to publish it ; if subsequent, it merely exonerated the defendants below from the consequences of that *particular act.*

Williams v. Dakin.

3. The covenant of the defendants below, as applied to the facts in this case, may be said to be a covenant, not to print, &c. the Intelligencer, nor the American Citizen, nor the Elucidator. Now it is well established that a release from the covenant as to one of these would not operate as a release from the covenant as to the others.

4. There is no analogy between this case and that of *provisos* or *conditions* in leases, or covenants connected with provisos or conditions, for re-entry. But if there is such analogy, then it is well settled, that the waiving or releasing *one* cause of forfeiture, or *one* breach of condition, does not affect the covenantee's right to avail himself of another.

5. To give to the paper executed by Dakin on the 22d January, 1830, the effect contended for by the defendants below, would prevert the evident intent of that transaction, and would enable them fraudulently to convert that paper to a purpose not contemplated by either party at the time of its execution.

After advisement, the following opinions were delivered:

By the CHANCELLOR. The alleged breaches of this covenant, upon the facts found by the special verdict, are 1st. That Williams assisted *Merrell* is establishing a political paper in Utica called the *Utica Intelligencer*, by hiring him his printing press for the avowed object of printing that paper, and by selling him types for that purpose—which types Williams had for sale on commission for a house in Philadelphia; and that a part of the first number of that paper was set up by Merrell in the office of Williams; and 2d. That Williams actually printed for *Wilson* 1000 copies of the first number of a miscellaneous paper established by the latter in the village of Utica, called the *American Citizen.*

I think from the facts stated in the special verdict, that the supreme court correctly held that there had been a breach of covenant on the part of Williams. No one who reads this special verdict can doubt for a moment that there was a palpable violation of good faith on the part of Wil-

liams, in endeavoring to have a rival paper established in Utica contrary to the spirit of the agreement under which he had received $3000 for the good will of the Utica Sentinel; and if he has violated the letter as well as the spirit of his covenant, the court ought not to be very anxious to find an excuse which will relieve him from the consequences of such violation. I am not prepared to say that the selling to Merrell of the types which were left with him for sale on commission, was aiding or being accessary to the establishment or printing of the paper, within the intent and meaning of the covenant; as a refusal to sell the types, although he knew they were to be used for that purpose, might have been a violation of his duty to his employers in Philadelphia. Neither is it necessary to say that he was not authorized to hire his own printing press to Merrill to enable him to publish the paper sooner than it could otherwise have been done. But as Williams had expressly covenanted that he would not be accessary to the establishing or printing of the paper, I think it was a breach of the covenant to suffer it to be set up in his own office. If he was to be excused on the ground that it was done without his knowledge or contrary to his will, I think the burden of proving that fact was thrown upon him; and that to excuse him, it should have been found by the special verdict that it was without his knowledge and contrary to his will. Finding the fact that it was done in his office, where, by the covenant, he had agreed it should not be done, and without showing that he or his agent took any means to prevent it, must, upon this special verdict, be considered a breach of his covenant. Independent of his breach, however, the printing of the first number of The *American Citizen* by Williams himself was not only an aiding, assisting and being accessary to the establishment and publication of that paper, but was also a breach of that part of the covenant which restricted him from suffering a miscellaneous, literary or political paper to be printed in a building owned by him. Although the first number was issued as a specimen number, and sent gratis to those who might not afterwards think proper to continue it, yet it was one of the papers which

Williams v. Dakin.

were to be paid for by those who should become the pa-
trons of the publication ; and the printing of that specimen
number was a more powerful aid to the establishment of
the paper, than the publication of any one of the subsequent
numbers would have been.

But it is said the whole covenant was released, by releas-
ing it so far as related to the right to publish the *Elucida-
tor*, and *Dumport's case*, 4 *Coke's Rep*. 119, is relied upon by
the counsel for the plaintiff in error as establishing that po-
sition.    That case, as Sir James Mansfield said, in *Doe* v.
*Bliss*, 4 *Taunt. Rep*. 736, the profession have always won-
dered at ; and I presume for the reason, that the decision
carried a technical principle beyond the bounds of common
sense.    But although that decision has been so long acqui-
esced in as a settled rule of law, in relation to the title to
real property which was liable to be forfeited by the breach
of a condition subsequent, that it should not now be disturb-
ed, it ought not to be extended to any other class of cases.
That decision proceeded upon the principle that where an
estate is granted upon a *condition* subsequent, if the con-
dition is once dispensed with, the estate becomes absolute in
the grantee, and cannot be divested by any future breach.
But such a principle is wholly inapplicable to a mere *cove-
nant*, which is in its nature divisible.    In a case nearly as
old as *Dumport's case*, *Smith* v. *Barnee*, *Trin. Term*, 11*th
James* 1*st*. 1 *Rolle's Abr*. 472, *pl*. 8, it was held that the
discharge of a part of a *covenant* was not a discharge of
the residue thereof.    In *Twynam* v. *Packard*, 2 *Barn. &
Ald. Rep*. 105, the distinction between conditions and cov-
enants, as to their divisibility, is also clearly established.
And in the very recent case of *Reed* v. *Norris*, 2 *Myl. &
Craig's Rep*. 361, where a son gave to his father a bond
for the payment of £1000, with interest thereon at five per
cent., and an agreement was afterwards made and endors-
ed upon the bond by which the father stipulated that he
would not call upon the son for the principal sum of £1000,
until he the father should have paid the principal and in-
terest of a bond for £500, in which the son had joined
with him as surety to a third person, Lord Cottenham

decided that the agreement did not affect the accruing in-
terest upon the £1000 bond; and that the executors of the
father were entitled to recover the same, although the prin-
cipal and interest of the bond which the son signed as
surety for the father, remained unpaid. I conclude, there-
fore, that the release of the covenant, so far as to authorize
the printing and publishing of the *Elucidator* so long as it
continued to be an anti-masonic paper, did not release the
covenant generally, so as to authorize Williams to aid in
the establishment of any other paper he pleased. Giving
such a construction to the release would unquestionably be
contrary to the understanding of both parties at the time
the release was obtained.

The remaining question is whether the $3,000 is to be
considered as a stipulated sum which both parties intended
should be paid as liquidated damages in case the covenant
was broken; and if so, whether there is any rule of law
which can authorize this court, or any other court, to say
the plaintiff in error shall be excused from performing his
agreement: in other words, whether this court can make
a new agreement for the parties which they never intended
to make for themselves. I think no one who reads the
covenant, can doubt for a moment that it was the intention
of both parties that if it was broken the whole $3,000
should be paid as the liquidated damages for such breach.
The object of the covenant was to protect Dakin and
Bacon and their assigns in the full enjoyment of the
good will of a public newspaper, and of its patronage, for
which good will and patronage they were paying the sum
of $3000: and as the value of the good will or patronage of
the paper, as well as the amount of injury which the pur-
chasers might sustain by any interference with it, were
*wholly uncertain and incapable of estimation otherwise than
by mere conjecture,* the amount to be paid upon the breach
of that covenant was not only a proper subject for stipula-
ted damages, but the precise sum paid for such good will or
patronage, appears to be that which the parties would nat-
urally fix upon as the amount to be refunded to the pur-
chasers upon any breach of the covenant. The proposi-

tion on the part of Dakin and Bacon, and which the other parties agreed to, was substantially this: " We will pay the $3000 which you demand for the good will and patronage of your paper, in addition to the actual value of the press and types and printing apparatus, if you will agreee to refund to us the $3000 as stipulated damages in case you interfere in any way with that good will and patronage, or aid or assist others in the establishment or publication of any paper which may interfere with it."

There is undoubtedly a class of cases in which courts have been in the habit of considering a certain specified sum as a *penalty*, whatever may be the language of the agreement. Such is the case wherever such specified sum is evidently intended as a mere collateral security for the payment of a different sum which is the real debt, or where it was evidently intended to be in the nature of a mere penalty ; and there is another class, where, from the language of the agreement, it was difficult to ascertain what the parties really *intended*, in which the courts have taken the reasonableness of the provision as liquidated damages into consideration, for the purpose of determining whether it was intended as such or only as a comminatory sum. Where the specified sum is declared by the parties to be a penalty, or wherever it appears to have been only intended to secure the payment of the real debt which is specified and ascertained, so that the court is legally bound to consider it as comminatory merely, the plaintiff must assign breaches, and have his damages assessed under the statute, except where the condition of the obligation is for the payment of a specific sum which is capable of being ascertained by mere computation.

In the case of *Astley* v. *Weldon*, 2 *Bos. & Pull.* 346, the £200 specified in the agreement was evidently intended to secure the payment of the smaller sums, and therefore, upon the settled rules of construction, it was considered as a penalty. Lord Eldon put his decision upon that ground alone, as he distinctly recognized the right of parties to contract for stipulated damages for the non-performance of agreements, like the present, where the damages were in

their nature uncertain, or a mere matter of fancy. The case of *Randall v. Everest*, 2 *Carr. & Payne*, 577, was an action of assumpsit upon an agreement not under seal, and Lord Tenterden said that he wished his observations in that case not to be understood as applying to agreements under seal. Whether his lordship was right in supposing that parties were not authorized to make a valid agreement for stipulated damages, without the formality of affixing a seal to it, is a question which it is not necessary for us now to consider. *Kemble v. Farren*, 6 *Bing. R.* 144, which was also an action upon an agreement without a seal, was like *Astley v. Weldon*, in many respects, as the £1000, which was stated to be stipulated damages, was intended to secure the smaller sums which the plaintiff had agreed to pay as wages to the defendant, as well as to insure to him the services of the defendant for the four seasons. And it could not be considered as a penal sum as to one part of the agreement without construing it to be such as to the whole. But, even in that case, Tindall, C. J. admits, that if the £1000 had been limited to those breaches of the agreement which were uncertain in their nature and amount, the whole sum would have been recoverable as liquidated damages. The same difficulty existed in the case of *Davies v. Penton*, 6 *Barn. & Cress.* 216 ; as the £500 was intended to secure the payment of £574 by the plaintiff, as well as the covenant not to prosecute, on the part of the defendant ; and it could not be considered as an agreement for liquidated damages as to one party, without considering it so as to the other. In addition to this, the parties in their agreement had called the £500 a penal sum, as well as liquidated damages. Looking to the whole agreement, therefore, the court came to the conclusion that the parties did not intend to contract for stipulated damages. The case of *Reilly v. Jones*, 1 *Bing. R.* 302, was like the case under consideration in one respect, as the sum which was agreed upon as stipulated damages was payable upon the non-performance of any part of the agreement ; and as it was evidently the intention of the parties that the whole sum should be payable upon any breach of the agreement, the plaintiff was permitted to recover the whole amount as liquidated

damages. In *Hubbard* v. *Grattan and wife, Alcock & Nap. R.* 389, in which an action was brought to recover the stipulated damages which the defendant had agreed to pay if he did not remove a lime kiln adjacent to the plantiff's premises, Bushe, Ch. J. says : " The stipulation consists of two parts, one affirmative that the lime kiln should be prostrated before a particular day ; the other negative that the assignee shall not at any future time erect another lime kiln ; and, upon those the breaches are assigned. Both bear on one object, to be relieved from the lime kiln altogether, and both are essential to that object being accomplished ; and both parties agree in measuring beforehand the damages consequent upon a breach of either agreement. Such stipulations as to damages are upheld by courts of law upon two grounds: 1st. Because a man may set a value not only upon matters connected with his property, which value is capable of being estimated, but also upon matters of taste or fancy, such as prospect or ornament, which he alone can appreciate ; and 2d. Because even in matters capable of ascertainment, great difficulties might occur in some cases ; and, in all cases, it is prudent in both parties to provide against the trouble and expense of a future investigation. The cases which seem to have interfered with such compacts, are those in which the subject matter of the stipulation shows that, whatever the form of it may be, the parties could not have contemplated any thing more than a penalty to secure against actual damage.

The case under consideration was one of uncertain damages which the parties evidently foresaw could not be ascertained by proof, with any degree of certainty, as the amount of injury to the plaintiffs by the establishment of a rival paper even for a few weeks might destroy the value of the good will and patronage of the paper they were about to purchase ; and as they contracted with each other upon the faith of that liquidated sum, as the utmost that the one party was to pay, and the least that the other was to receive, in case of a breach of the agreement, it would be manifestly unjust for us to attempt to make a better or a different agreement for them than that which they intended

to make for themselves ; by compelling them to abandon the amount of damages which they had agreed upon in anticipation of the breach of the contract which has occurred, for the purpose of submitting the question of amount to the chance of what a jury might suppose was proper from hearing the conflicting opinions and vague conjectures of ignorant or prejudiced witnesses.

The cases in our own courts, which were referred to on the argument, are all in accordance with this view of the subject ; and it is, therefore, unnecessary that I should attempt to analyze them particularly. It is perfectly clear, therefore, if the plaintiffs in the court below were entitled to recover any thing for the breach of this agreement, they were entitled to the whole $3000 which had been agreed upon by the parties as stipulated damages for any breach of the covenant.

For these reasons I think the judgment of the supreme court ought to be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows :

*In the affirmative*—*Senators* FURMAN, HAWKINS, HULL, MAYNARD, PECK—5.

*In the negative*—The PRESIDENT of the Senate, The CHANCELLOR, and *Senators* BEARDSLEY, CLARK, HUNT, HUNTINGTON, JOHNSON, JONES, LEE, H. A. LIVINGSTON, NICHOLAS, PAIGE, POWERS, SKINNER, SPRAKER, STERLING, VAN DYCK, VERPLANCK—18.

Whereupon the judgment of the supreme court was AF-FIRMED.