## FISHER *vs.* FISHER.

### *In the matter of the Estate of* LEONARD FISHER, *deceased.*

IF an agent has been necessarily employed in the collection of rents of leasehold estate, by executors under a trust in the will, his commissions may be allowed; but if an executor has himself performed the service, he cannot receive any other compensation, than his regular statutory commissions.

In case of a continuing trust for the payment of annuities, the executors may account annually, or make annual rests and receive commissions accordingly.

The testator being the owner of leasehold premises under a lease, containing a covenant on the part of the lessor, to renew the term or to pay " the value of *such* buildings as should be erected in pursuance of the lease ;" and the lease contained a covenant on the part of the lessee, to have the buildings on the premises made *fire-proof*, within two years, which covenant was not performed by the lessee :—Held, that in consequence of the breach of the covenant by the testator, the lessor not being bound to renew the term, the executors were not chargeable with loss for a failure to renew.

The executor or administrator of the lessee, becomes personally responsible to the lessor for rent of leasehold premises, accruing subsequent to the death of the testator or intestate, only to the extent of the profits of the land. If he renews the term, the new lease becomes assets ; but if he purchases the reversion in fee, the acquisition does not enure to the benefit of the estate.

Whether by renewing the term, executors make themselves personally liable on the covenants of the new lease—*Quære.* If they do, this is no excuse for losing the value of the right of renewal, because that right[2] if valuable, may be sold.

Lands devised by the testator, having been previously mortgaged by him as security for the payment of the debt of H. ; and H., the debtor, having after the testator's decease transferred to the executors a bond and mortgage, as collateral security for the liability growing out of the previous transaction :—Held, that H. being the original debtor, and the land of the testator surety for that debt, the devisee took the land with a right as against H. to exoneration from the mortgage ; and that the executors having received securities from H. sufficient to discharge the mortgage, the devisee had an equitable claim to the specific application of the proceeds of those securities by the executors, towards the extinction of the incumbrance.

Executors are trustees of funds properly applicable to a specific purpose ; and such assets are trust and not general assets.

> WILLIAM KENT, *for the Executors.*
> THOS. C. T. BUCKLEY, *for Legatees.*
> J. S. BOSWORTH, *for Devisees.*

THE SURROGATE. The testator, by his will, set apart the rents of certain leasehold estate in William and Pearl Streets, in the city of New-York, for the purpose of forming a fund, out of which his executors should pay specified legacies and annuities ; and within one year after all the legacies should be paid or compromised, he directed his executors to sell all his remaining property, and divide the avails among his eight children, or their representatives. Until the time arrived for the sale and distribution, it was the duty of the executors to collect the rents of this leasehold property and apply them to the payment of the legacies and annuities. The collection of the rents was, by the consent of some of the parties in interest and of the other executors, intrusted to the charge of Leonard Fisher, one of the executors, who for his services in this respect charged, and was paid by the executors, five per cent. commissions, besides the regular statutory commissions claimed by all the executors jointly on this accounting. Where an agent has been necessarily employed by executors in the collection of rents, his commissions may be allowed as an expense attending the management of the estate, and in the city of New-York, five per cent. is under ordinary circumstances a fair and usual charge. But when an agent has not been in fact employed, and the executor has himself performed the service, he cannot be allowed any other commissions than those directed (1 *Hopkins' R.*, 28 ; 2 *Paige*, 287 ; 3 *Paige*, 412,) by the statute regulating his compensation. It is said the rents were collected by the executors as trustees, but I do not see how that affects the rule, the trust, if it be regarded as one, relating to personalty, and being in them as executors and not as individuals *nominatim*. (2 *Barb. C. R.*, 438.) As trustees, however, they remain under the application of the same rule in regard to commissions, being limited to the statutory compensation, provided for executors, except in case of the expences attendant on the actual employment of an agent.

Annual rents or annual accounts, are often directed or

prescribed by the Court, for the purpose of charging the executor, administrator or guardian, with the interest upon the annual balances, and where this is done, the commissions are to be computed upon the amount actually received and paid over each year. (6 *Paige*, 216; 9 *Paige*, 467.) In the present case, the rents in question are appropriated for specific purposes, among which is the payment of annuities, so that a continuing trust is constituted and annual payments provided for. The executors might have accounted annually, and by so doing, have been entitled to commissions upon the annual receipts. I see no just objection, now, against directing annual rests in the accounts, so as to charge the executors with the interest on the annual balances, and credit them with commissions on the annual receipts and payments.

The only remaining objection to the account of the executors, arises out of their failure to renew the Corporation leases of Nos. 267 and 269 William Street. These leases commenced in March, 1826, and expired May 1, 1847. They contained a covenant on the part of the lessee, to have the buildings on the premises made fire-proof, within two years from the date, and a covenant on the part of the lessors, to renew or to pay " *the value of such buildings as should be erected in pursuance of the lease.*" The buildings were old and dilapidated, the lessee broke his covenant in not making them fire-proof, and the term expired without a renewal. One of the executors bought the fee or reversion, before the expiration of the term, and sold it some years afterwards at an advanced price.

Terms for years vest in the executor, who becomes *personally* responsible for the subsequent rent to the extent only of the profits of the land, which he is bound to apply to that purpose; for the proportion of the rents which exceeds the profits, he is chargeable only as executor. (*Toller*, 143, 279.) If the executor renew, the new lease of course becomes assets; (3 *Bac. Ab.*, 58; 11 *Vesey*, 392; 3 *Meriv.*, 190; 3 *Russ.*, 225; 3 *Russ.*, 241; 1 *M. & K.*,

226); but if he purchase the reversion in fee, the acquisition, being of another right and interest, does not enure to the benefit of the estate. (*Toller*, 141–2 ; *Wms. on Ex'rs*, 537, 538 ; 11 *Viver*, 227 ; *Randall* vs. *Russell*, 3 *Meriv.*, 190 ; *Norris* vs. *Le Neve*, 3 *Atk.*, 26 ; *Hardman* vs. *Johnson*, 3 *Meriv.*, 347 ; 2 *Spence on Equity*, 303.) Ordinarily, the executor, in the absence of special directions, should dispose of the term ; by so doing, he can escape personal responsibility as assignee, and at the same time he discharges the duty the law imposes upon him, of converting the assets into money, ready for distribution. But here the testator manifestly contemplated that the executors should continue to hold the original term and collect the rents, and apply them to the payment of legacies and annuities. The executors have not, therefore, been guilty of a *devastavit* in not selling. The executors contend, that they were not bound to renew the lease, on the ground that they, thereby, would have made themselves personally liable. I do not deem it necessary to inquire,—how far executors would become personally liable on the usual covenants to pay rent, in a renewed lease, if those covenants were framed so as to be obligatory on them only " as executors" (7 *Taunt.*, 581 ; 7 *B. & C.*, 444 ; 2 *C. B.*, 654 ; 9 *Wend.*, 273 ; 13 *Wend.*, 557),—or if the exposure to such liability is sufficient excuse for not renewing. If the covenants for renewal, &c., were of no value, the executors are not chargeable with any loss ; if they were of value, and the executors did not renew, they might have sold the right to a new term, and therefore should respond for the value. (*Stiles* vs. *Burch*, 5 *Paige*, 135 ; 2 *Freem.*, 12 ; 7 *Simon*, 28 ; 9 *Price*, 476 ; *Plowden*, 286.) But the covenant to renew on the part of the lessors, in this case, was entirely at their option, and they were at liberty to refuse, subject, however, to the right of the lessee to insist upon the payment of the value of such buildings as might be erected on the premises pursuant to the terms of the lease. The executors urge, that the lessee having broken his covenant

by failing to make the buildings fire-proof, &c., they could not enforce the covenant to pay for their value. I think this position sound. (11 *Viner*, 228.) The acceptance of rent during the original term, doubtless waived on the part of the lessors the breach of the condition or covenant, to the extent of that term ( *Williams* vs. *Dakin*, 22 *Wend.*, 209) ; but the covenant to pay, which only came into operation on the expiration of the original term, is limited to payment for " *such*" buildings, as the lessee had previously bound himself to build; it was only for " *such*" buildings the lessors had agreed to pay, and not for any other. The breach of the covenant related, therefore, to a matter of substance, essential and material, grafted into the very body of the covenant to pay, so as to form its primary consideration. (1 *Saunders' R.*, 320, *note* 4 ; *Greenleaf's Cruise*, *Vol. II.*, *p.* 2, *new ed.*) Such being the case, the executors did not have a good right of action upon this covenant, and nothing in contemplation of law has been lost by their neglecting to prosecute it. These considerations seem to have weighed upon the minds of the executors, and in view of the personal interest they had in the estate, I have no doubt they acted in good faith, and as they thought best for all parties concerned. In any event, I do not think they are responsible for failing to attempt enforcing a covenant, which could not be enforced. The purchase of the fee, as I have already intimated, did not enure to the benefit of the estate ; so that there is no view of the transaction upon which the executors can be made liable.

On the 19th March, 1832, the testator mortgaged part of his real estate to G. L. Morton, for $2000. The property thus mortgaged was devised to George Fisher and his children, and the devisee claims that certain assets, which have come into the hands of the executors, from Robert D. Hepburn, should have been specifically applied to the extinguishment of this mortgage.

It appears that Hepburn negotiated the loan, that the

money was paid to him by Morton the mortgagee, that at the time, he avowed that the money was borrowed for his accommodation, and he was to pay the interest on the mortgage, and that he did subsequently pay the interest on the mortgage up to the death of the testator.

In December, 1832, Hepburn gave the testator a bond and warrant of attorney for $3000, which were found among his papers at his decease, and upon which no interest had been paid; and in November, 1835, Hepburn transferred to the executors, a bond and mortgage belonging to him, amounting to $3000, as collateral security for the payment of his bond of $3000 to the testator. The bond and mortgage so assigned, were subsequently paid, and this of course discharged Hepburn's bond for $3000, as collateral security for which they were assigned.

In the consideration of an equitable claim, I am disposed not to be trammelled by the particular shape in which the transaction has been thrown; for substantial justice could seldom be attained in equity, if the Court regarded forms instead of substance. There is no doubt that as between the testator and Morton, the testator was the borrower, and Morton the lender; but as between the testator and Hepburn, it is just as clear, that Morton was the lender, Hepburn the borrower, and the testator and his land the sureties. The testimony of Morton and Harrison, and the subsequent payment of the interest by Hepburn, make this too plain for discussion. Before the testator took Hepburn's bond for $3000, he certainly could have compelled Hepburn to pay the Morton mortgage, whenever it fell due. I also think, that the precise consideration of the bond and warrant of attorney not being indicated, it is a natural as well as legal presumption, that it covered the amount of the Morton loan. Besides, the whole transaction, the terms of the bond, the non-payment of interest on it, the payment of interest by Hepburn on the Morton bond, the acquiescence of the executors in this construction of the affair, and their acts based on such an under-

standing of it, all favor the same idea and make it unreasonable to doubt its correctness. The bond and warrant of attorney effected no payment; they were mere securities, and did not change the previous equitable relations of the parties, except in providing a definite security for the enforcement of the equitable claim the testator had against Hepburn, for the exoneration of his estate. This equitable claim did not grow out of a loan by the testator to Hepburn of his money, but out of a loan of his property; when the property was devised, therefore, it was only surety and not principal for a debt; and it passed to the devisee just as it stood,—so far as related to Morton, bound primarily for the $2000,—but as to Hepburn, entitled to exoneration from the mortgage. A devisee takes real estate subject to its liens, but entitled also to the benefit of such collateral securities as the testator possessed for the protection of the land. Suppose the testator had taken from Hepburn a bond to pay the Morton mortgage, can there be a question that the benefit of such a bond would have accrued to the devisee, the same as any covenant or agreement relating to the land, and designed for its protection and indemnity?

The transaction would have been capable of another version, had the testator treated the bond of $3000 as a liquidation of all his claims against Hepburn, and while himself assuming the payment of the Morton mortgage, principal and interest, looked to Hepburn's bond of $3000, and treated it as an original and independent security. This was not done; after Hepburn gave his bond, as before, he went on paying the interest to Morton, and there is nothing to show, that the bond of Hepburn was regarded as a substitute for or an extinguishment of the obligation of Hepburn to pay the Morton mortgage. One was not taken in lieu of the other; the original relations of the parties were not changed; but a bond and warrant of attorney taken, the parties continuing after, to act the same as they had done before.

Regarding then Hepburn's bond as security to the tes-

tator, for the loan he had made of his property, and the assignment of the Hughes bond and mortgage having been made by Hepburn as security for his bond, it follows that the Hughes bond and mortgage came into the executors' hands as indemnity, to the extent of $2000, and for the benefit of the land mortgaged to Morton and devised to George Fisher and his children. They were not entitled to it as general assets, but took it in trust for the owners of the land. Had there been no bond given by Hepburn, and had he not assigned the Hughes mortgage to the executors, it is obvious the devisee could have compelled him in equity to protect the devised property against the Morton mortgage. This was doubtless his original equitable obligation. The testator, though he took a bond from him, did not choose to disturb the relations as then existing; but the executors have done so, and in taking from Hepburn the sum requisite to discharge him from his liability to pay the Morton mortgage, have no right to turn that amount into the general assets of the estate, but must apply it to the object to which it is equitably applicable.

It is no answer that the land must pay its own mortgages. The statute is explicit as to this. But if the devisees pay the Morton mortgage, they have a right to the fund put in the hands of the executors, by Hepburn, to pay it. The devisees do not "*resort*" to the executors. They resort to Hepburn; and he having paid the executors, they claim the application of the fund so paid, to the purpose for which it was paid. They ask nothing of the executors, as executors, out of the general assets; but only seek against the executors as *trustees* of a specific fund, its proper appropriation. (*Harsall* vs. *Smithers*, 12 *Vesey*, 119.) In *Parry* vs. *Ashley*, 3 *Sim.*, 97, the proceeds of a policy of insurance effected by the executrix, who was devisee in fee, subject to an annuity to the testator's widow, were declared to be affected with a trust for the benefit of the parties interested in the real estate, and not to be considered as part of the testator's personal estate. The principle that executors

are trustees of funds properly applicable to a specific pur-pose, and that such are trust and not general assets, is well settled, and as the facts appear in the present instance, I think it is applicable to this case. The result will be that the accounts must be adjusted without reference to the Morton mortgage, on the supposition that the executors applied the $2000 received from Hepburn out of the Hughes mortgage, to the extinction of the Morton mort-gage, as they were in equity bound to do.