# NEW YORK COMMON PLEAS.

JOHN KEMP *et al.* agt. THE KNICKERBOCKER ICE COMPANY.

*Breach of executory contract — fraud — damages.*

Where defendants, wholesale ice dealers, enter into a written contract with the plaintiffs, retail ice dealers, for the sale and delivery to the latter of a certain amount of ice in one year, at a stipulated price, and the contract provides "that, in case of the inability of the defendants to lay up a full supply of ice, or other casualties, then the defendants are bound only to deliver to the plaintiffs such proportion of the above amount during such year as the quantity of ice laid up be to their full supply:"

And, under this clause, the defendants inform the plaintiffs that they had been unable to lay up a full supply of ice for that year, and, upon measurement of the whole amount, the plaintiffs were entitled only to twenty-nine thirty-thirds per cent of the amount stipulated to be delivered as their proportion, and thereupon procured from the plaintiffs a defeasance, or modification of the contract, to that extent (the plaintiffs not then having the means of ascertaining, other than the defendants' statement, the correctness of such information),

When, in fact, the defendants had then their full and usual supply of ice, but claimed that the amount of new ice which defendants had received and laid in from two different sources was the supply to which the plaintiffs were limited, when no limitation of the quantity, nor the obtaining of it from any particular source, was mentioned in the agreement:

The defendants not only grossly violated their contract, but, in doing it, perpetrated a palpable fraud on the plaintiffs in procuring from them a modification of the contract accepting a portion of the ice, when they were justly entitled to their full amount.

The damages to which the plaintiffs are properly entitled to recover of the defendants for the breach of the contract is the difference between the contract-price and the market-price on the ice not delivered under the contract at the time of the breach.

In the contract was a clause, in substance, that the plaintiffs agree to pay, and the defendants to forfeit, one dollar for each ton of ice unaccepted

or undelivered. This sum of one dollar thus agreed to be paid on the one part and forfeited on the other, must be regarded as a penalty for a forfeiture, and not as stipulated damages for a breach of the contract.

*General Term, February,* 1876.

THE defendant, a corporation organized under the laws of this state, entered into two contracts with the plaintiffs, dated respectively February 25, 1864, and October 25, 1869, for the sale and delivery of ice during a period of several years at a stipulated price. Two thousand tons were to be delivered under each contract in the year 1870, the ice to be delivered daily (Sundays excepted) from defendant's depots in the city of New York, and to be sold by plaintiffs, in their retail business, at such price or prices as the defendant might, and which it subsequently did, establish for that year. Defendant reserved the right to cancel said contracts if the plaintiffs should at any time sell all or any of such ice otherwise than at retail to customers for consumption.

The following provision in each of the contracts is the subject of the present controversy:

"It is, however, provided, and so understood by the parties to this agreement, that in case of the inability of the parties of the first part to lay up a full supply of ice or other casualties, then and in that case the parties of the first part are bound only to deliver to the parties of the second part such proportion of the above amount, 2,000 tons of ice, during such year as the quantity of ice laid up be to their full supply."

Defendant, in 1870, gathered and stored in its own ice houses on the Hudson river and Rockland lake 147,064 tons of new ice. It had also a supply of other large quantities, viz., old ice in the same ice houses and in barges 18,088 tons; also, large quantities of new pond ice, 25,548 tons; also, certain other large quantities of ice gathered and stored in stacks at various points on the Hudson river and elsewhere, 10,500 tons; also, ice gathered and stored on joint account with and

in the name of the Washington Ice Co., between 60,000 and 70,000 tons, of which the defendant was entitled to two-thirds; and, also, certain other large quantities of ice secured by purchase from other parties, for use as a part of its supply for the year 1870.

On or about May 25, 1870, the defendant represented to plaintiffs that it had been unable to lay up a full supply of ice for the year 1870; that it had measured the ice it had, and that 29.33 per cent of the 2,000 tons stipulated to be delivered — or 587 tons on each contract — was the full and fair proportion which the plaintiffs were entitled to receive. Believing and relying upon this representation, and without knowledge to the contrary, the plaintiffs were induced to execute two indorsements on the original contracts, in the words following:.

NEW YORK, <em>May</em>, 1870.

"In consideration of one dollar and other considerations, I agree to accept 587 net tons of ice as my pro rata of this contract for the year 1870, on the same terms and conditions mentioned in this contract.

"J. & W. KEMP & CO."

The 29.33 per cent thus allowed and accepted was estimated upon a measurement of the new ice only (147,064 tons), and plaintiffs did not know, or have the means of knowing, what supply of ice defendant actually had. After the execution of these subsequent agreements, and during the year 1870, plaintiffs took and received from the defendant 1,180 tons of ice in addition to the 587 tons delivered under said contracts, and paid therefor to defendant, from time to time, the same price paid by parties having no contract, viz., from thirteen dollars to sixteen dollars per ton, whereas the prices named in the contracts above mentioned were respectively two dollars and two dollars and fifty cents per ton.

In April, 1873, plaintiffs brought this action for the rescission of the two agreements of May 25, 1870, on the ground

of fraud, and for damages. The court, at special term, found for the plaintiffs, setting aside said agreements as fraudulent, and finding, as questions of fact that defendant was able to lay up and had laid up a full supply of ice for the year 1870, within the meaning of its contracts with the plaintiffs. Judgment was rendered for $64,891.61 against the defendant, who brings this appeal.

*S. P. Nash*, for appellant.

*Joseph H. Choate*, for respondent.

LARREMORE, *J.*— The questions presented by this appeal may be considered in the following order :

1. The construction of the contracts of February 25, 1864, and October 25, 1869, and the alleged breach thereof by the defendant.

2. The validity and effect of the agreements of May 25, 1870, as a defeasance or modification of said prior contracts.

3. The measure of damages resulting from said alleged breach.

The true interpretation of these contracts must be sought in the intention of the parties as expressed therein, without violating the rules of law or language.

The defendant agreed to sell, and the plaintiffs to purchase, 4,000 tons of ice at a stipulated price during the year 1870. The defendant was thus bound to such a performance on its part as was within the range of human possibility (*Beebe* agt. *Johnson*, 19 *Wendell*, 500; *Harmony* agt. *Bingham*, 12 *N. Y.*, 99; *Del.*, *Lack. & Western R. R. Co.* agt. *Bowns*, 4 *J. & Sp.*, 126 — *reversed* 58 *N. Y.*, 573, *but on other grounds; Booth* agt. *Spuyten Duyvil Rolling Mill Co.*, 3 *S. C.*, 368 — *affirmed in court of appeals*).

The absence of any qualifying clause in the contracts would have enforced a resort to such sources and the use of such means to obtain or lay up a full supply as were known and used by wholesale dealers.

But the liability thus assumed was qualified by a subsequent clause in said contracts, which provided that "in case of the inability of defendant to lay up a full supply of ice or other casualties, then in that case" the defendant was only bound to deliver, and plaintiffs were entitled to receive, such proportion of said 4,000 tons of ice during such year as the quantity of ice laid up would be to said full supply. An attempt was made on the trial to explain and restrict the meaning of the terms "inability to lay up" and "full supply," but the testimony offered for that purpose was so unsatisfactory and contradictory that the court below properly disregarded it. Applying, then, the ordinary rules of interpretation to these contracts, we shall reach the extent of the defendant's liability.

The agreements in question, as has been shown, were running, executory contracts, covering a period of years, made between ice dealers, and in contemplation of the necessary demand and supply for the purposes of trade. Each of the parties, therefore, should be held to such interpretation as was contemplated by them when said contracts were executed.

The chief purpose of the contracting parties, as expressed in their agreements, was that one should sell, and the other purchase, 4,000 tons of ice in each of the years specified. As the plaintiffs were bound to take, so the defendant was bound to furnish the ice as agreed, subject only to the possible contingency of an inability to lay up a full supply. The defendant claims that this question of supply has reference to and is to be determined by the capacity of its ice houses upon Rockland lake and the Hudson river, and the new ice supplied therefrom each year. There is nothing in said contracts that would authorize such a construction, nor was it established at the trial that plaintiffs so understood it. There is no reference or restriction to the place or places from which the supply of ice was to be taken, nor that the same was to be laid up in houses at all. For this reason the construction

upon this point must be *contra proferentem*, and as it has been established that in the year 1870 defendant had sufficient ice to meet all the demands of its contract dealers, the conclusion must follow that in the year last mentioned no such contingency as was contemplated by and provided for in said contracts had happened.

The defendant's counsel relies upon the case of the *Del., Lack. & West. R. R. Co.* agt. *Bowns* (58 *N. Y.*) in support of his interpretation of these contracts. In that case the company was excused from performance of its contract by reason of a strike among its miners and employes, for which provision was made by a clause in the contract. But the court (per ALLEN, J.) distinctly held that if the company had brought about the strike to avoid its contract, and in fraud of the rights of the defendants in that suit, the liability of the company would not have been avoided. It did not appear that said company had obtained coal by other means or from other sources; in which respect the case relied on differs materially from the case under consideration.

2d. The validity and effect of the subsequent agreements of May, 1870, have been determined by the judge who tried the cause. He finds that said agreements were obtained by false and fraudulent representations made by the defendant to the plaintiffs, upon which they relied and acted, to wit: "that defendant had been unable to lay up a full supply of ice for the year 1870; that it had measured the ice it had, and that twenty-nine per cent of the 2,000 tons stipulated in each contract to be delivered during the year, or 587 tons of ice under each contract, was the full and fair proportion which the plaintiffs were entitled to receive." Whereas it appeared in evidence, and as a finding of fact, that said per centage was estimated on a measurement of the ice in defendant's own ice houses, gathered in 1870, on the Hudson river and Rockland lake; that all other ice whether old or newly gathered, belonging to and laid up by the defendant in 1870, was not included in such measurement, and of which

fact plaintiffs were not apprised at any time prior to the execution of said agreements; and further, that the defendant was not unable to lay up, but did lay up, a full supply of ice for the year 1870, and "had on hand an ample supply to fill and satisfy all their existing contracts."

These findings of fact are all based on competent testimony, and (in the absence of any gross error or mistake) are conclusive upon the point that said subsequent agreements are no bar to a recovery in this action.

It remains to be considered (3d) whether the amount for which judgment was rendered is the proper measure of damages in this case. This involves, in the first instance, the construction of the following clause in said contracts: "And the parties of the second part (the plaintiffs) hereby agree to pay to the parties of the first part (the defendant) one dollar per ton for each and every ton that they fail to take according to the terms of this agreement, and the parties of the first part also agree to forfeit one dollar per ton for each and every ton that they fail to deliver according to the terms of this agreement." Is the one dollar per ton thus agreed to be paid on the one part and forfeited on the other to be regarded as a penalty for a forfeiture, or as stipulated damages for a breach of the contract?

The principles involved in this proposition have been so thoroughly considered and expressed in the numerous authorities found in the books, that any extended review of them would be improper and unnecessary. In the following cases the rules governing liquidated damages are established: 7 *John.*, 72; 7 *Cow.*, 307; 5 *Seld.*, 551; 6 *Seld.*, 241; 16 *N. Y.*, 469; 21 *N. Y.*, 253; 9 *N. Y.*, 551; 38 *N. Y.*, 71; 10 *N. Y.*, 241; 2 *Hilt.*, 47; 1 *Abb. Dec.*, 445; 3 *Daly*, 462; 11 *Ind.*, 70; 5 *Mich.*, 123; 17 *Mich.*, 95; 17 *Iowa*, 23; 11 *Ohio* (*N. S.*), 349; 42 *Mo.*, 594; 17 *Wend.*, 447; 4 *Wend.*, 468; 13 *Wend.*, 587; 26 *Wend.*, 630; 22 *Wend.*, 201; 10 *Barb.*, 59; 11 *Barb.*, 137; 12 *Barb.*, 366; 18 *Barb.*, 336; 19 *Barb.*, 106; 35 *Barb.*, 27; 50 *Barb.*, 616; 14 *Abb. Pr.*,

59; 10 *Wis.*, 30; 16 *Wis.*, 57; 6 *Cal.*, 158; 10 *Cal.*, 512; 25 *Cal.*, 67; 35 *Cal.*, 452. And the cases in which the amount fixed by the parties to a contract as damages is regarded as a penalty, are: 5 *Cow.*, 144; 1 *Den.*, 464; 9 *Paige*, 101; 2 *Edw. Ch.*, 471; 4 *E. D. Smith*, 220; 64 *Barb.*, 23, *overruled in* 53 *N. Y.*, 394; 16 *Ill.*, 475; 9 *Cal.*, 584; 19 *Cal.*, 330; 2 *Minn.*, 350; 16 *N. Y.*, 275; 17 *Barb.*, 260; 18 *Barb.*, 50; 38 *Barb.*, 643; 38 *Barb.*, 71; 41 *Barb.*, 648; 14 *Wis.*, 219; 10 *Mich.*, 29; 3 *Iowa*, 244; 9 *Iowa*, 265.

All these authorities agree that whether the amount fixed by a contract is to be held as stipulated damages or as a penalty, depends upon the intent of the parties, and the peculiar circumstances of the case. Hence the difficulty of adjudicating upon cases which are apparently similar but essentially different. Where an agreement of this kind is in the alternative form, to do a certain act or pay a certain sum, the covenantor has his election either to perform or pay the stipulated sum. (2 *Bos. & Pul.*, 353; *Slosson* agt. *Beadle*, 7 *John.*, 72; *Pearson* agt. *Williams*, 26 *Wend.*, 630.)

So, also, in a penal bond with a condition for the payment of a sum less than that named as the penalty, the liability of the obligor is limited by the conditional clause. In both cases the intention of the parties is clearly expressed; but in agreements when the defaulting party stipulates to forfeit or pay a fixed sum either as a penalty or as liquidated damages, the question of intention is often one of doubt and complication.

Where the damages resulting from a breach of the contract are uncertain and cannot be accurately estimated, the parties have been allowed to settle the amount in advance (*Bagley* agt. *Peddie*, 16 *N. Y.*, 469; *Clement* agt. *Cash*, 21 *N. Y.*, 253; *Nobles* agt. *Bates*, 7 *Cow.*, 307; *Smith* agt. *Smith*, 4 *Wend.*, 468; *Williams* agt. *Dakin*, 22 *Wend.*, 201; *Mundy* agt. *Culver*, 18 *Barb.*, 336). So, also, where the sum fixed upon applies to each breach, or where all the con-

ditions are to be simultaneously performed (*Dunlap* agt. *Gregory*, 10 *N. Y.*, 241; *Clement* agt. *Cash, ante*).

*Cottreal* agt. *Talmage*, decided in this court (1 *E. D. Smith*, 573) and affirmed by the court of appeals (9 *N. Y.*, 551), broke fresh ground in the doctrine as to how far the sum named in the condition of a penal bond might be regarded as a penalty. That case has been cited with approval, and followed as an authority in subsequent adjudications, and the principles there laid down must be here applied in discerning the border line between a penalty and liquidated damages. The test in favor of the latter is shown to be "manifest difficulty in ascertaining damages arising from the breach, a fair conclusion that the amount is specified and agreed on for the purpose of saving the expense or avoiding the difficulty of proving the actual damages, and especially where the amount fixed and liquidated is not far beyond what might probably be expected to arise from a breach of the contract."

In the contracts under consideration the plaintiffs agree to pay and the defendant to forfeit one dollar for each ton of ice unaccepted or undelivered. Did the parties intend that the words "pay" and "forfeit" should be construed as synonymous terms? In a recent case in the court of appeals (*Noyes* agt. *Phillips*, 16 *Abb. Pr.* [*N. S.*], *No.* 5), chief justice CHURCH holds that "the word forfeit is not conclusive, and that the words employed must in general yield to the intention of the parties as evinced by the nature of the agreement, the amount of the sum named, and all the surrounding circumstances."

Conceding, for the sake of the argument, that the sum the defendant was to forfeit in case of default on its part was understood and accepted as the extent of its liability when the contracts were executed, can any inference be drawn from this that such sum was to be the measure of damages which might probably be expected to arise from a fraudulent breach of the contract to deliver ice as agreed? It is manifest that the plaintiffs never contemplated or agreed upon a

basis of compensation that would give the defendant the benefit of its own fraud. What, therefore, the parties did not originally intend, the court will not now enforce, especially when it appears that the sum stipulated is so inadequate to the loss occasioned by defendant's own wrong (*Lampman* agt. *Cochrane*, 16 *N. Y.*, 275; *Richards* agt. *Edick*, 17 *Barb.*, 260). All that plaintiffs claimed in their complaint as damages for the alleged breach was the difference between the contract-price and the wholesale market-price (sixteen dollars per ton) on the ice not delivered under said contracts. This difference was estimated at thirteen dollars and fifty cents per ton upon 1,413 tons on one contract, and fourteen dollars per ton on the other, making $38,857.50 in all, with interest thereon from January 1, 1871. This follows the general rule in cases of an ordinary breach of contract for the sale and delivery of merchandise whereby the vendee is allowed to go into the market to supply the deficiency caused by a non-delivery, and hold the vendor for any excess in price. A different rule was adopted upon the trial, and in the decision of this case, whereby it was held (by reason of the peculiar nature of the contracts in dispute) that plaintiffs were entitled to recover thereunder for gains prevented as well as losses sustained; that the parties having agreed that said ice was to be sold at retail at prices fixed by the defendant, such retail prices might be taken as a basis of the damages incurred by the plaintiffs.

The case presents the following statement of the computation of such damages:

|  | Tons. |
|---|---|
| Ice to be delivered on each contract.......... | 2,000 |
| Received on account...................... | 587 |
| Due on each contract...................... | 1,413 |
| Ice bought after May 25, 1870, by plaintiffs from defendant at price of $17,686.87........... | 1,180 |

Kemp agt. Knickerbocker Ice Company.

| | | |
|---|---|---|
| Ice not delivered: | | |
| Contract calls for...................... | | 2,000 |
| Received on pro rata........ | 587 | |
| One-half of 1,180 tons bought, | 590 | |
| | | 1,177 |
| Undelivered in each contract............. | | 823 |

Price at which each of said parcels of 823 tons could have been sold........... $18,611 32
Deduct contract-price, viz.:

| | | |
|---|---|---|
| Two dollars per ton on first contract, leaves .............. | $16,965 32 | |
| Two dollars and fifty cents per ton on second contract, leaves, | 16,553 82 | |
| | $33,519 14 | |
| Interest from December 31, 1870, to November 16, 1874....... | 9,098 58 | |
| | | $42,617 72 |

Ice paid for since May 25, 1870, $17,686 87.

| | | |
|---|---|---|
| Deduct contract-price, reckoning one-half on each contract, | $15,031 87 | |
| Interest from dates of payment.. | 4,338 28 | |
| | | 19,370 15 |
| Total amount of recovery............... | | $61,987 87 |

No doubt can exist of plaintiff's right to recover said sum of $19,370.15, which was the excess of payments and interest for ice that was covered by the contracts.

A more serious question arises as to the two parcels of 823 tons which were never delivered, and for which damages have been allowed, as before stated, at the retail price per ton, on the ground that such a basis of estimation may be supposed to have entered into the contemplation of the parties. Such is the doctrine laid down in *Griffin* agt. *Colver*

(16 *N. Y.*, 489); *Starbird* agt. *Barrons* (38 *id.*, 230); *Passenger* agt. *Thorburn* (34 *id.*, 634); *Messmore* agt. *N. Y. Shot and Lead Co.* (40 *id.*, 422). Do these authorities control the present case? If the plaintiffs had purchased ice to meet the deficiency of the undelivered quantity (and it appears that they could have done so at sixteen dollars per ton) in that event the claim for damages would have been the difference between the sum last named and the contract-price, with interest thereon. Their position then would have been the same as if the like quantity of ice had been delivered by the defendant, subject to a recovery for excess in price. Having thus omitted or neglected to reinstate themselves as to the quantity of ice to be delivered and required, can they charge the defendant with the loss of expected gains which their own act might have prevented?

*Griffin* agt. *Colver* was an action upon a breach of contract to deliver a steam engine at a day certain, to drive a planing mill and other machinery, whose operations were suspended by the failure to deliver, and the ordinary rent or hire which could have been obtained for the use of such mill and machinery was allowed, upon proof of the amount, as proper compensation for the use of the property, which was partially unoccupied by reason of such failure to deliver, the court holding that "the rent of a mill or other similar property, or the use of the machinery, are not only susceptible of more exact and definite proof, but, in a majority of cases, would be found to be a more accurate measure of the damages sustained than any estimate of anticipated profits. That rents are graduated according to the value of the property, and to an average of profits arrived at by very extended observation."

*Starbird* agt. *Barrons* was a suit for damages by a common carrier for failure to furnish full cargo, delay in loading, detention of boat, &c., proof of which was excluded on the trial, and which was held to be admissible.

In *Passenger* agt. *Thorburn* there was a breach of an express warranty that the seed sowed would produce Bristol

cabbages, and a recovery was sustained for the value of such a crop, less the expense of raising, &c.

Nothing is found in these authorities to vary the rule that, in a breach of contract for the sale and delivery of an article of general use and consumption, the damage recoverable is the difference between the contract-price and the market-price at the time of the breach.

The decision in *Messmore* agt. *N. Y. Shot and Lead Co.* rests upon the ground of the vendor's knowledge of an existing contract by the purchaser for a resale at an advanced price of the article which such vendor agreed to supply for the purpose of fulfilling such contract.

It is unnecessary to cite other authorities upon this point, as the four cases last referred to have reviewed and settled the principle upon which expected gains may be allowed as damages upon a breach of contract for delivery of merchandise. The plaintiffs have not sought to rescind, but to affirm, their contracts with the defendant. All they can ask is to be placed in the same situation, by damages awarded, as if the contracts had been performed. If that had been done they must necessarily have incurred the hazard and fluctuations of trade in retailing the ice at the prices fixed. The defendant was under no obligation to indemnify them in such a case. As they could have supplied their deficiency under the contracts from an open market, and charged defendant with excess in price, should they be allowed to recover a larger sum or be placed in any better position than they would have been by a full performance of the contracts?

The only proof offered by plaintiffs to show that all the ice contracted for could have been sold at retail at the prices fixed is their simple declaration to that effect. It was not shown that they had a particular set or number of retail customers, or that they had an agreement with any one upon which they could have been held responsible. How, then, can it be assumed, as stated, that they could have sold all such ice at the prices named? Their retail trade was entirely

Kemp agt. Knickerbocker Ice Company.

dependent upon the possible wants of a fluctuating and uncertain community. Suppose a majority of the consumers, in view of the enhanced and somewhat exorbitant price of ice during the year 1870, had discontinued its use, and others had reduced their former supply, shall it be decided that profits thus contingent and speculative may be recovered as damages, or that they may be reasonably presumed to have entered into the contemplation of the parties to these contracts? It will hardly be contended that the authorities can be stretched to cover such a state of facts. The damages sustained by reason of the non-delivery of the two parcels of 823 tons is the difference between the market-price as shown (sixteen dollars per ton) and the contract-price, viz.:

| | | |
|---|---:|---:|
| 823 tons at $14 | $11,522 | 00 |
| 823 tons at $13.50 | 11,110 | 50 |
| | $22,632 | 50 |
| With interest from January 1, 1871, to November 16, 1874 | 6,139 | 06 |
| To this must be added the sum paid in excess of contract-prices, and interest | 19,370 | 15 |
| | $48,141 | 71 |

Making defendants liable for damages in this amount for breach of the contracts in question, to which sum the judgment should be reduced. The other exceptions in the case do not appear to be well taken, and the judgment appealed from should be affirmed for the amount last mentioned.

C. P. DALY, C. J., and J. F. DALY, J., concurred.

Filed in open court February 7, 1876.